The Annex Corporation v. Commissioner.
Annex Corp. v. Commissioner
Docket No. 105231.
United States Tax Court
1943 Tax Ct. Memo LEXIS 292; 2 T.C.M. (CCH) 167; T.C.M. (RIA) 43256; May 24, 1943
*292 B. J. Feigenbaum, Esq., 111 Sutter St., San Francisco, Calif., and John J. Goldberg, Esq., for the petitioner. Harry R. Horrow, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: This proceeding involves the following deficiencies and addition to tax for the year 1937: Addition to
tax for
failure to
Deficiency
file return
Income Tax
$ 7,374.20
Excess Profits Tax
2,790.24
Personal Holding Com-
pany Surtax
14,519.89
$3,629.97
Stated generally the issues are: (1) What was the fair market value of San Francisco real estate - a lot and building near Third and Market Streets - when acquired by petitioner on or about July 1, 1937? (2) Did petitioner realize "personal holding company income", as such term is defined under Title 1 A of the Revenue Act of 1936 as amended by section 351 et seq. of the Revenue Act of 1937, when it acquired the real estate? In other words, was there a gain "from the sale or exchange of stock or securities" and if so how much? (3) Did respondent err in disallowing a claimed deduction of $2,690.16 as amortization of a leasehold? Petitioner claims that it made an overpayment of income *293 tax in the amount of $211.02. This is denied by respondent. Respondent, upon brief, also requests determination of petitioner's basis for depreciation upon the building in the event it is held that the total value of the real estate on the basic date is less than determined by him. Findings of Fact Petitioner is a California corporation with its principal office in San Francisco, California. It was organized on or about June 9, 1937. Its income tax return for the calendar year was filed with the collector of internal revenue at San Francisco, California, and the tax shown to be due amounting to $211.02 was paid on or subsequent to March 8, 1938. Petition was filed herein October 17, 1940. Alexander Boyd Estate (hereinafter referred to as Estate) was, and for many years prior to July 1, 1937, had been a California corporation with its principal office in San Francisco, California. Alfred I. Esberg was the president and manager of this corporation from 1919 until its dissolution on or about July 1, 1937. In 1927 Estate acquired a group of properties near Third and Market Streets in San Francisco, known as the Claus Spreckles properties. The Claus Spreckles Building (also known as *294 Central Tower Building) is a twenty-story office building located on the corner, having a frontage of 75 feet on Market Street and extending 70 feet on Third Street. Immediately to the south of this building and adjoining it was a small building 30feet X 75feet and immediately south of it was a building known as the Third and Stevenson Building. Adjoining these buildings on the west (partially also on the north of the Stevenson Building) was a building known as the Annex Building, having a frontage of 50 feet on Market Street and a depth of 100 feet. This property to be valued as of July 1, 1937. The Annex Building was originally constructed shortly after 1906. At the time it was acquired by Estate it was a one-story building divided into 4 small stores, used for such purposes as a shoe repair establishment, a cigar store, a jewelry shop and a coffee shop, each of which paid a monthly rental of approximately $500. The building consisted principally of a front of comparatively cheap construction, a roof, a floor and a full basement, most of its side walls being the contiguous walls of the Spreckles Building or the Stevenson Building adjoining it on the south and east. On April 21, *295 1930, Estate entered into a lease agreement with Morris Plan Co. of San Francisco (hereinafter referred to as Morris Plan) covering a one-story banking room building to be constructed on the Annex Building site. Estate agreed to expend $40,000 for that purpose, any excess to be repaid to it by Morris Plan. The lease to Morris Plan is for a term of 15 years from July 29, 1930. It provides for monthly rental of $2,083.33 for the first year, $2,250 for the second, $2,500 for the next three years and $2,750 for the remaining 10 years. It was modified on July 5, 1934, at the insistence of Morris Plan, the rent being reduced from $2,500 to $2,083.33 for the period August 1, 1934, to July 31, 1935, from $2,700 to $2,083.33 for the next two year period, to $2,166.66 for the succeeding two year period, and to $2,250 for the following two year period. The aggregate reduction was $47,000, in consideration of which Morris Plan paid Estate $23,500. Estate had paid out $17,296 as its agreed part of the loss sustained by Morris Plan in connection with an unexpired lease on premises formerly occupied by it. Estate sold all of the Spreckles properties, except the Annex Building, on April 6, 1934, *296 and at that time granted the purchaser an easement of light preventing any owner of the Annex Building from constructing any building thereon more than six stories in height so long as the Claus Spreckles Building continued in existence. It also sold to the purchaser the heating plant in the basement of the Annex Building, which was used to heat the Claus Spreckles Building as well as the Annex Building, and leased sufficient space in the basement of the Annex Building to the purchaser to enable it to operate the heating plant as well as for a storeroom and work shop. The purchaser agreed to pay $17.50 or $20 per month for the last mentioned space and also agreed to furnish heat to the Annex Building for a consideration of $25 per month, subject to the right to remove the heating plant from that building. Pursuant to the contract with Morris Plan a one-story banking room building was erected after the old building was demolished. It was necessary to do a substantial amount of work on the walls and foundations, the first floor had to be levelled and reinforced and the entire front had to be completely reconstructed. Some changes and alterations were made in the basement, the sidewalk *297 in front was removed, steel trusses were installed to sustain the roof thus making an open banking room free of any interior supporting columns and a ventilating system was put in. An acoustical ceiling was installed and an inlaid floor was placed over the old one. The ceiling is quite high and the front attractive. Windows extend from the street level almost to the room, and four stone pillars appear to support the roof, the remainder of the front being cut stone. The total cost of the demolition of the old building and the construction of the new was $53,477.57, $11,967.73 of which was paid by Morris Plan and $41,509.84 by Estate. The property is located on the south side of Market Street - one of the principal down-town streets of San Francisco - near Third Street. It is in a very good section of the city, close to the "best block in San Francisco" - the block between 4th and 5th Streets - where there are many retail stores. The apparent growth trend, however, is toward 5th and 6th Street rather than toward 3rd. Several multiple story buildings have been built in the block between 3rd and 4th, most of which have not been "economic successes", the exception being the Class A buildings *298 such as the Claus Spreckles Building, also known as the Central Tower, and the Humboldt Bank Building. Estate was indebted to Matilda Esberg, mother of Alfred I. Esberg, in the sum of $90,000 at the time of her death in 1934. The indebtedness was evidenced by a promissory note in that amount, which was inherited by her five children. The basis of each $18,000 share so inherited was $5,400 or 30 percent of face value. On July 1, 1935, Estate issued to each of the five children of Matilda Esberg its promissory note for $18,000 in substitution of the $90,000 note. Alfred I. Esberg at an undisclosed time purchased two of the $18,000 notes from his brothers for $10,000 each. He transferred these notes, together with the one originally payable to him, to petitioner herein or on or about June 30, 1937, in consideration for the issuance to him of 1,000 shares of its common stock. This was the only stock issued. The three notes were recorded on petitioner's books "on the basis of cost to Alfred I. Esberg" or $25,400. On the same date petitioner acquired the other two notes "in consideration of the issuance of The Annex Corporation's own notes in denominations of $18,000 each" payable in *299 monthly installments of $225 with interest at the rate of 4 percent per annum. These were recorded on petitioner's books at $36,000. The five notes of Estate, payable to the Esberg heirs, were cancelled. On or about July 1, 1937, petitioner acquired all the assets of Estates, consisting of the Annex Building property, the Morris Plan lease, pledged mortgages receivable aggregating $75,168.86, subject to indebtedness of $52,127.55, and improved realty in Los Angeles having a value of $6,000. The agreement recited that petitioner was "transferring to * * * [Estate] five (5) notes executed by * * * [Estate], each in the face amount of $18,000 for and in consideration of * * * [Estate] transfereng to * * * [petitioner] certain properties including * * * [Estate's] interest in the notes * * *." Following the transfer of its assets Estate wound up its affairs and dissolved. The Annex Building property, on July 1, 1937, was subject to a first mortgage of $217,701.43 to the San Francisco Bank and to a deed of trust for $25,000 to American Trust Co. or an aggregate of $242,701.43. The deed of trust was also security for a pre-existing indebtedness for which the creditor had other security. *300 The following schedule shows the computation made by petitioner under which it determined that it sustained a capital loss of $10,060.12 and the computation made by respondent under which he determined that it made a profit of $24,939.88. Petitioner
Respondent
Value of Annex Bldg. Property
$265,000.00
$300,000.00
Less Mortgage
242,701.43
242,701.43
Net Equity
$22,298.57
$57,298.57
Value of L.A. Real Estate
6,457.16
Less Lien
457.16
Net Equity
6,000.00
6,000.00
Value of Mortgages Receivable Pledged
75,169.86
Less Notes Payable
52,127.55
Net Equity
$23,041.31
$23,041.31
Totals
$51,339.88
$86,339.88
Notes Receivable -
Obligations of Estate surrender in
exchange
$61,400.00
$61,400.00
Loss
$10,060.12
Profit
$24,939.88
The Annex Building, exclusive of the lot was carried on petitioner's books at a value of $40,000; but depreciation during the taxable year was computed on the basis of a valuation of $49,575. Respondent determined that petitioner's basis for depreciation was $100,000. He accordingly increased its allowance for depreciation from $757.08 to $2,000. In addition to the income (or loss) shown in the schedule *301 above petitioner, during the taxable year, received income from the following sources in the amounts shown: Interest on Loans, Mortgages
and Notes
$ 2,465.75
Gross Rents
13,416.67
In its return of income petitioner deducted the sum of $2,690.16 as amortization of "Excess Rentals" or "Surplus Income" which it had set up on its books substantially as follows: Value of Annex Building and Land
$215,000.00
Fair net return on physical value of property 6% per annum or
12,900.00
Total amount to be received from tenant in excess of "Fair Net Return"
79,398.50
Capitalization on a basis of 8% per annum gives a value of
51,152.00
Amortization of the $50,000 (sic) is to be deducted annually as follows: 6 Mo. 1937
$2,690.16
Year 1938
5,414.80
(Similar amounts during remainder of lease period)
Total
$50,000.00
Respondent disallowed the claimed deduction of $2,690.16 from gross income, holding "that there is no authority in the applicable revenue act for the allowance of the deduction claimed." The fair market value of the Annex Building property on July 1, 1937, was $275,000. Opinion Respondent determined that the Annex Building *302 property had a fair market value of $300,000 when acquired by petitioner on July 1, 1937. He assigned $100,000 to the building and allowed depreciation on that basis, apparently attributing the remaining $200,000 to the lot. Petitioner, as shown by our findings, determined that the lot had a value of $175,000, the building $40,000 and the "Excess Rentals" or "Surplus Income" $50,000, a total of $265,000. We have found that the property had a total fair market value on the basic date of $275,000. The question is essentially one of fact. As is frequently true in a valuation case no amount can be completely rationalized, explained or justified. Many factors must be, and in the instant proceeding have been, considered; but the precise effect of each cannot be stated. No useful purpose would be served by setting out, or attempting to make a complete summary of, all the evidence. A brief resume of some of it, however, will not be amiss. Four witnesses, each of whom had made an appraisal of the property, were called by the parties as witnesses. Each appeared to have a sufficient background of training and experience to enable him to express an opinion as to the value of the property on *303 the basic date and each did so. The values fixed by them ranged from $260,000 to $300,000. The first witness called by the petitioner had made an appraisal of the property at the request of Esberg shortly before it was acquired by petitioner. He placed a value upon it of $260,000 and, when asked by Esberg to explain how he determined that value, wrote him a letter which was introduced in evidence in this proceeding. Therein he stated that in his opinion the lot had a value of $175,000, the building $40,000 and what he denominated the capitalized value of the leasehold, $45,000. The basis for assigning a separate value to the leasehold was the fact that under the terms of the lease the lessee had agreed to pay a total of $79,398.50 in excess of what the witness determined to be a fair net return on the physical value of the property. He stated that he had taken into consideration all of the factors which he thought should be considered in reaching a conclusion as to the fair market value of the property, remarking, however, that he and his firm had been experiencing some difficulties in securing good tenants for their properties and that he himself "was quite pessimistic about the *304 future" of the particular block in which the property was located. The other two witnesses for the petition had appraised the property as of October 26, 1936. They placed a value upon it of $267,000. They determined that the average net income of the property would be $18,700 per annum to July, 1941, which they capitalized at seven percent, resulting in the value stated. When asked under cross examination why they had taken the average income only to July, 1941, although the lease term did not end until 1945, it was stated that the annual rental for the last portion of the term was so excessive that it should not be considered. Both witnesses stated that the amount fixed by them was figured to be about what the property could be expected to sell for on the basic date. One estimated the value of the land to be $200,000, though the other valued it at $175,000. None of the three witnesses made any detailed examination of the building proper but assumed that it was worth approximately $50,000. The witness called by the respondent "made detailed calculations based on recognized standards of practice of the income value of the property using various methods of approach." He determined *305 that it had a fair market value of $300,000, though some of the methods utilized by him for the purpose of "checking" his estimate resulted in figures above or below that amount. This witness assumed, in making his mathematical calculations, that the amount specified in the lease would be paid. He also assumed that the building had an income producing life of at least ten additional years, though he deducted "one third from the profit in order to take care of possible decrease in the market." It would unnecessarily extend this opinion to discuss in more detail the testimony of the appraisers. Other facts and circumstances bearing upon the question have been considered by us, some of which would support a lower and some a higher valuation than we have found. In the former category is the fact that a bank had appaised the property in 1931 for the purpose of a loan at $375,000 and petitioner had attempted to sell it for $325,000. In the latter are the following: The tenant has found the space too small for its business and arrangements have been perfected to move when the lease expires. The building is largely "a one-purpose building", suitable only, unless substantially remodelled, *306 for use by another financial institution or possibly by an insurance company. The lack of an alley in the rear and the fact that the lot, unlike those adjoining it, does not extend through to the street back of it, tend to limit the use to which the lot and the building may be put. The light casement limiting the type of building which may be constructed, the lack of side walls, the use of the basement by adjoining tenants for the heating plant and the trend of the retail business away from the location of the property also have a tendency to detract from its value. Cases cited by the parties, enunciating well-established principles of valuation or discussing the weight to be given to certain evidence, have been examined but need not be discussed. It is sufficient for present purposes to state that they have all been considered by us in arriving at the valuation which we have found. The next question appears to be moot. The net income as disclosed by petitioner's return was $1,461.37. The respondent added capital gain of $26,939.88 (profit on acquisition of the assets as shown in the first schedule in our findings, being $24,939.88 profit as determined by him plus $2,000 claimed *307 by petitioner in its return as a capital loss), amortization $2,690.16, and organization expense $151.31. The last item is not in controversy. The issue involving the amortization of $2,690.16 will be discussed later; but decision on it must be in favor of respondent. The question as to the precise amount of depreciation to be allowed will also be alluded to briefly later; but for present purposes it will be assumed that the respondent correctly increased petitioner's allowance by $1,340.74. The basic facts, then, are as shown by the following schedule: Net income as disclosed by return
$1,461.37
Add: Capital gain, computed as follows: Equities in property received
$61,339.88
Less Cost basis
61,400.00
Loss
60.12
Capital Loss Claimed in Return
2,000.00
Excess Capital Loss Claimed
$1,939.88
Amortization
2,690.16
Organization Expense
151.31
$4,781.35
Total net income
6,242.72
Less Additional depreciation as allowed by respond-
ent
1,240.74
Net income adjusted
$5,001.98
The parties have stipulated that petitioner received interest on loans, mortgages and notes in the amount of $2,465.75, gross rents from Annex Building of $12,916.67 *308 and gross rents from the Los Angeles real estate in the amount of $500. They do not agree upon the net rents and the amounts deducted by petitioner included the amortization item of $2,690.16 presently in issue. The amounts deducted by petitioner did not include however, as much depreciation on the Annex Building as the respondent has allowed. Whether the net rents were as reported by petitioner - $9,662.55 - or as determined by the respondent, they constituted more than 50 per centum of petitioner's gross income, including any profit resulting from an exchange of the notes for the property (section 353 (g), Revenue Act of 1937); so the question whether the profit is to be treated as "personal holding company income" under section 353 (b) of the Revenue Act of 1937 may be passed. Petitioner's contention that it is entitled to a loss deduction in the amount of $10,060.12 is, of course, denied. It is allowed a deduction of $60.12. Inasmuch as it deducted $2,000 as a capital loss in its return $1,939.88 must be added to its net income as shown in the schedule above. The next issue arises upon petitioner's claim for "Amortization or Depreciation of Capitalized Leasehold Value." The last *309 schedule in our findings shows how the computation was made by petitioner. As heretofore indicated the claim cannot be allowed. Petitioner entered into a transaction with Estate under which it acquired all of its assets on July 1, 1937. Esberg was the president of Estate and the sole stockholder of petitioner. Members of his family having a financial interest in the property which he was acquiring for his wholly-owned corporation, he quite properly caused an independent appraisal of it to be made. The appraiser determined that the Annex Building property had a fair market value of $260,000 on the basic date, which was substantially the same amount as determined a few months earlier by another group of appraisers. ($267,000.) Both groups properly took cognizance of the fact that the building was rented advantageously - clearly a proper factor to be taken into consideration in determining value, , certiorari denied ; ; especially in view of the fact that no sales of comparable property had been made at or near *310 the basic date. Neither group of appraisers was asked to make an attempt to evaluate separately the lease with Morris Plan and neither did so. In the report submitted by the one first-mentioned, however, it was suggested that the value of the lot was $175,000 and the value of the building was $40,000. The appraiser assumed that a fair annual return on that valuation was $12,900 and called attention to the fact that under the terms of the lease Morris Plan would pay a total of $79,398.50 in excess of that amount during the life of the lease. He therefore concluded that it would be proper to "capitalize this surplus income" on the basis of $45,000. This seems to have been the genesis of the entries on petitioner's books. Petitioner relies upon Article 23 (a) - 10 of Regulations 94, which authorizes the purchaser of a leasehold, who acquired it for business purposes for a specified sum, to take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run. The regulation appears to have been promulgated primarily for the benefit of one who has purchased a lessee's rights under a lease and it has been applied under such facts *311 in numerous cases, including ; ; ; and , cited by petitioner. The present record is devoid of any suggestion that Estate and petitioner dealt in any arms-length transaction involving the sale of the Morris Plan lease separate from the real estate though upon brief it is urged that the lease was "acquired as a separate item." Since no such finding can be made the question of law discussed by the parties is never reached. Whether the regulation or a similar rule may be applied where a purchase is made of a lessor's interest and the effect, if any, of the subsequent of contemporaneous acquisition by the same party of the fee simple title to the property, may be passed until a case involving those facts arises. Cf. . Respondent's request that the basis of the building for depreciation be determined *312 in the event it should be held - as it has been - that the value of the real estate was less than determined by him, cannot be complied with. It was not made an issue under the pleadings, was not the specific subject of any testimony, and is not discussed by either party upon brief. The only evidence touching upon the subject was an incidental reference to depreciation by the witness called by the respondent as an expert and asked to express an opinion as to the value of the property. He placed a value upon the building proper of $85,000 when it was completed in 1930, deducted depreciation at the rate of two per centum per annum and concluded it had a value of $73,100 when acquired by petitioner on July 1, 1937. Later he estimated that "the cost plus residual value of the building" when completed in 1930 was $75,000. Petitioner, as shown by the findings, claimed depreciation of $757.08 on a valuation of $49,575. This indicates a rate of one and one-half per centum per annum or an assumed life of 66 2/3 years. Respondent determined a basis of $100,000 and allowed depreciation of $2,000, obviously assuming a useful life of 50 years. The basis upon which depreciation is to be allowed *313 is probably the adjusted basis provided in section 113 (b) of the Revenue Act of 1936. (Sec. 114, Revenue Act of 1936.) That has not been shown nor have we been given the necessary factors for computing it. The question is too important to be decided unless fully tried. . It is accordingly passed. Unless settled by the parties, we shall, without prejudice to either, refrain from disturbing the respondent's allowance. Decision will be entered under Rule 50.